[No. A118434. First Dist., Div. One. Sept. 15, 2008.]

SONG X. SUN et al., Plaintiffs and Appellants, v.
CITY OF OAKLAND, Defendant and Respondent.

## COUNSEL

Casper, Meadows, Schwartz & Cook, Andrew C. Schwartz and Thom Seaton for Plaintiffs and Appellants.

John Russo, City Attorney, Randolph W. Hall, Assistant City Attorney, William E. Simmons and Christopher Kee, Deputy City Attorneys, for Defendant and Respondent.

## OPINION

**SWAGER, J.**—While crossing International Boulevard in Oakland at an unmarked pedestrian crosswalk, Rong Zeng Peng was struck by an automobile and killed. Her husband and minor daughter sued the City of Oakland (City) and others, alleging that Ms. Peng's death was proximately caused by the dangerous condition of the intersection where the accident occurred. City moved successfully for summary judgment on the ground, among others, that the intersection was not in a dangerous condition as a matter of law. Appellants appeal from the adverse judgment. Finding no triable issues of

material fact with respect to the existence of a dangerous condition, we affirm.

## FACTUAL BACKGROUND

The following facts are, in essence, uncontroverted and taken from the evidence submitted by the parties in support of, and in opposition to, the motion for summary judgment.[1]

International Boulevard is a four-lane thoroughfare with two lanes going in each direction. Just before 9:00 p.m. on October 20, 2004, Ms. Peng attempted to cross International Boulevard where it intersects with 7th Avenue. The crosswalk at this intersection had been marked with painted stripes in the past, but it was unmarked at the time of the accident. A driver proceeding in the left lane of International Boulevard saw her from about a block away and stopped to allow her to cross. As she emerged from behind the stopped car and crossed into the right lane, she was struck by a car driven by Ramon Jackson. Jackson had initially been driving in the left lane, but he moved his car to the right lane in order to get around the stopped car and did not see Ms. Peng crossing in his path until it was too late to stop. He fled the scene immediately after the accident and later turned himself in to the police. As part of a plea bargain, he pled no contest to felony vehicular manslaughter with gross negligence. (Pen. Code, § 192, subd. (c)(1).)

## PROCEDURAL HISTORY

On November 17, 2005, appellants filed their first amended complaint, asserting claims for premises liability against City based on the theory that Ms. Peng's death was caused by a dangerous condition of public property. Specifically, they alleged: "Decedent was crossing the street at the corner of International Boulevard and 7th Avenue, near the Clinton Park Adult School. The intersection in which decedent was walking used to have in place a painted crosswalk for pedestrians for several years prior to this incident. However, sometime prior to the subject incident the City of Oakland repaved the roadway and never replaced the crosswalk. Decedent was walking across this street when she was struck and killed in the unmarked crosswalk. In April of 2005, the crosswalk was finally replaced."

On February 6, 2007, City moved for summary judgment on the following grounds: (1) that the intersection was not in a dangerous condition as a matter of law; (2) that the undisputed evidence shows that no dangerous condition of

---

[1] All of the facts presented in this opinion come solely from the evidence presented in connection with City's motion for summary judgment.

public property caused the accident; and (3) that even if a dangerous condition did cause the accident, City was immune by operation of Government Code sections 830.4 and 830.8. In opposition to City's motion, appellants argued that disputed facts created material fact issues for trial with respect to: (1) whether the unmarked crosswalk was a dangerous condition, and (2) whether the dangerous condition was a concurrent cause of the accident.

The trial court granted City's motion, finding as a matter of law: (1) that the site of the accident was not in a dangerous condition, (2) that there was no evidence the accident was caused by City's earlier removal of the crosswalk markings, and (3) that there was no triable issue of material fact as to whether City was immune from liability. This appeal followed.

## DISCUSSION

I. *Standard of Review*

A defendant may move for summary judgment "if it is contended that the action has no merit . . . ." (Code Civ. Proc., § 437c, subd. (a).) "A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (*Id.*, subd. (p)(2).) "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Id.*, subd. (c).) "We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

"In undertaking our independent review of the evidence submitted, we apply ' "the same three-step process required of the trial court: First, we identify the issues raised by the pleadings, since it is these allegations to which the motion must respond; secondly, we determine whether the moving party's showing has established facts which negate the opponent's claims and justify a judgment in movant's favor; when a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material

factual issue. [Citations.]" ' [Citation.]" (*Dawson v. Toledano* (2003) 109 Cal.App.4th 387, 392 [134 Cal.Rptr.2d 689].)

## II. *Dangerous Conditions of Public Property*

■ A public entity is generally liable for injuries caused by a dangerous condition of its property if "the property was in a dangerous condition at the time of the injury, . . . the injury was proximately caused by the dangerous condition, . . . the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and . . . either: [¶] . . . [a] negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] . . . [t]he public entity had actual or constructive notice of the dangerous condition [in time to prevent the injury]." (Gov. Code, § 835.)[2]

■ For purposes of an action brought under section 835, a " 'dangerous condition,' as defined in section 830, is 'a condition of property that creates a substantial . . . risk of injury when such property or adjacent property is used with due care' in a 'reasonably foreseeable' manner. (§ 830, subd. (a).)" (*Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 147 [132 Cal.Rptr.2d 341, 65 P.3d 807] (*Bonanno*).) "The existence of a dangerous condition is ordinarily a question of fact; however, it can be decided as a matter of law if reasonable minds can come to only one conclusion concerning the issue." (*City of San Diego v. Superior Court* (2006) 137 Cal.App.4th 21, 28 [40 Cal.Rptr.3d 26]; see § 830.2.[3]) With respect to public streets, courts have observed "any property can be dangerous if used in a sufficiently improper manner. For this reason, a public entity is only required to provide roads that are safe for reasonably foreseeable careful use. [Citation.] 'If [] it can be shown that the property is safe when used with due care and that a risk of harm is created only when foreseeable users fail to exercise due care, then such property is not "dangerous" within the meaning of section 830, subdivision (a).' [Citation.]" (*Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1196 [45 Cal.Rptr.2d 657] (*Chowdhury*).)

---

[2] All subsequent statutory references are to the Government Code except where otherwise indicated.

[3] Section 830.2 provides: "A condition is not a dangerous condition within the meaning of this chapter if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used."

III. *The Motion for Summary Judgment*

A. *Allegations of the complaint*

From the complaint and appellants' moving papers, it appears that their claim rests on the contention that City created the allegedly dangerous condition by failing to repaint crosswalk markings after City had installed bulb-out sidewalk extensions and repaved the street as part of a streetscaping project.[4] Between June 9 and June 11, 2004, a few months prior to the accident, the bulb-outs were installed and City removed the existing crosswalk markings. Appellants note there is no evidence that Ms. Peng was not using due care as a pedestrian while crossing the intersection and assert that the "key question" is whether City's failure to re-mark the intersection after having made the intersection "pedestrian friendly by the installation of bulb-outs" created a dangerous condition.

B. *City's motion for summary judgment*

City framed its motion for summary judgment against appellants' response to a special interrogatory asking them to "describe the dangerous condition of public property" that existed at the intersection. Appellants' response was: "The dangerous condition was the state of the intersection itself. There was no marked pedestrian crosswalk and no warning signs. There was also a lack of any positive controls at the intersection of International Blvd. and Seventh Avenue, i.e., traffic signals, stop signs, flashing beacons, within the crossing. Additionally, the intersection was poorly lit." On appeal appellants focus their dangerous condition claim on the unmarked crosswalk only. This is most likely in recognition of section 830.4, which provides immunity for the failure to install devices such as warning signs, traffic signals, and stop signs.[5] Appellants also appear to have abandoned any claim with respect to the lighting conditions.

With respect to the unmarked crosswalk, City argued: "[T]he fact that the crosswalk was not marked . . . is irrelevant, and certainly does not create a dangerous condition. Under California law, a crosswalk is either marked or unmarked, and the obligations of drivers and pedestrians to exercise caution

---

[4] A bulb-out is an extension of the sidewalk, usually at the corner of an intersection, that lessens the distance pedestrians must traverse across a street.

[5] Section 830.4 excludes from the definition of "dangerous condition" a condition resulting "merely" from failure to provide regulatory traffic controls or definitive roadway markings. It states: "A condition is not a dangerous condition within the meaning of this chapter merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs, as described by the Vehicle Code, or distinctive roadway markings as described in Section 21460 of the Vehicle Code."

and to yield the right of way are largely the same regardless of the markings or lack thereof." In support, City cited to Vehicle Code sections 275,[6] 21950,[7] and 21951,[8] as well as to *Moritz v. City of Santa Clara* (1970) 8 Cal.App.3d 573, 576 [87 Cal.Rptr. 675]. City also asserted it was immune from liability under Government Code sections 830.4 and 830.8.[9]

In their separate statement of undisputed facts, City set forth the circumstances surrounding the accident, including deposition testimony from Jackson to the effect that he knew at the time of the accident he was required to stop for pedestrians at unmarked crosswalks, and that he did not stop for Ms. Peng because he "didn't see a person in front of the car that was stopped [in the left lane]" and "figured [he] didn't need to stop." City also set forth the testimony of the driver in the left lane who had initially stopped for Ms. Peng. The driver's testimony supported the conclusion that pedestrians crossing at this intersection were visible from a block away and there were no physical impediments associated with the intersection that would prevent a driver from seeing and stopping for pedestrians.

---

[6] Vehicle Code section 275 defines a crosswalk as either: "(a) That portion of a roadway included within the prolongation or connection of the boundary lines of sidewalks at intersections where the intersecting roadways meet at approximately right angles, except the prolongation of such lines from an alley across a street. [¶] [Or] (b) Any portion of a roadway distinctly indicated for pedestrian crossing by lines or other markings on the surface."

[7] Vehicle Code section 21950 provides: "(a) The driver of a vehicle shall yield the right-of-way to a pedestrian crossing the roadway within any marked crosswalk or within any unmarked crosswalk at an intersection, except as otherwise provided in this chapter. [¶] (b) This section does not relieve a pedestrian from the duty of using due care for his or her safety. No pedestrian may suddenly leave a curb or other place of safety and walk or run into the path of a vehicle that is so close as to constitute an immediate hazard. No pedestrian may unnecessarily stop or delay traffic while in a marked or unmarked crosswalk. [¶] (c) The driver of a vehicle approaching a pedestrian within any marked or unmarked crosswalk shall exercise all due care and shall reduce the speed of the vehicle or take any other action relating to the operation of the vehicle as necessary to safeguard the safety of the pedestrian. [¶] (d) Subdivision (b) does not relieve a driver of a vehicle from the duty of exercising due care for the safety of any pedestrian within any marked crosswalk or within any unmarked crosswalk at an intersection."

[8] Vehicle Code section 21951 provides: "Whenever any vehicle has stopped at a marked crosswalk or at any unmarked crosswalk at an intersection to permit a pedestrian to cross the roadway the driver of any other vehicle approaching from the rear shall not overtake and pass the stopped vehicle."

[9] Section 830.8 provides: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code. Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such failure if a signal, sign, marking or device (other than one described in Section 830.4) was necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care."

## C. *Appellants' opposition*

In opposing City's position that the intersection was not in a dangerous condition, appellants relied heavily on City's alleged failure to comply with Vehicle Code section 21950.5. This statute provides: "(a) An existing marked crosswalk may not be removed unless notice and opportunity to be heard is provided to the public not less than 30 days prior to the scheduled date of removal. In addition to any other public notice requirements, the notice of proposed removal shall be posted at the crosswalk identified for removal. [¶] (b) The notice required by subdivision (a) shall include, but is not limited to, notification to the public of both of the following: [¶] (1) That the public may provide input relating to the scheduled removal. [¶] (2) The form and method of providing the input authorized by paragraph (1)." It is undisputed that City did not follow the procedures set forth in this section before removing the marked crosswalk where the accident occurred.

Appellants also argued that a triable issue of fact exists as to whether the unmarked crosswalk was dangerous due to the recently installed bulb-outs, which encouraged pedestrian traffic. They cited to concerns about pedestrian safety expressed by community members and city employees, a history of pedestrian accidents at the intersection, and a declaration prepared by their expert witness. They also asserted that City did not qualify for the immunities of Government Code sections 830.4 and 830.8 due to its failure to comply with Vehicle Code section 21950.5.

## D. *The trial court's decision*

The trial court found "The undisputed facts establish that the intersection where the accident that is the subject of this action occurred was not in a 'dangerous condition' within the meaning of Government Code [section] 835, and that Plaintiffs' claims are barred by the immunities provided by Government Code [sections] 830.4 and 830.8." The court further found that "even if Oakland failed to comply with Vehicle Code [section] 21950.5, Plaintiffs cite no authority that this section provides a basis for imposing liability based on dangerous condition of public property. Nor does [the statute] clearly demonstrate a legislative intent to withdraw or qualify the immunity provided by Government Code [sections] 830.4 and 830.8. . . . In any event, Plaintiffs fail to submit any competent evidence that Oakland's failure to comply with Vehicle Code [section] 21950.5 caused Mr. Jackson to violate Vehicle Code [sections] 21950 and 21951 in a grossly negligent manner, leading to decedent's death."

IV. *The Grant of Summary Judgment Was Proper*

A. *Relevance of third party conduct*

Appellants claim that City's reliance on the circumstances of the accident itself is insufficient to establish the absence of a dangerous condition. They assert that a third party's negligent conduct does not preclude a jury from finding public property to be a dangerous condition. While we agree that Jackson's negligent conduct would not necessarily absolve City from liability for creating a dangerous condition, we also note that his conduct, standing alone, does not prove that the intersection itself posed a substantial risk of injury to pedestrians generally.

■ "A public entity may be liable for a dangerous condition of public property even where the immediate cause of a plaintiff's injury is a third party's negligent or illegal act . . . if some physical characteristic of the property exposes its users to increased danger from third party negligence or criminality. [Citation.] But it is insufficient to show only harmful third party conduct, like the conduct of a motorist. ' "[T]hird party conduct by itself, unrelated to the condition of the property, does not constitute a 'dangerous condition' for which a public entity may be held liable." ' [Citation.] There must be a defect in the physical condition of the property and that defect must have some causal relationship to the third party conduct that injures the plaintiff. [Citation.] '[P]ublic liability lies under [Government Code] section 835 only when a feature of the public property has "increased or intensified" the danger to users from third party conduct.' [Citation.]" (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1348 [75 Cal.Rptr.3d 168].)

B. *Appellants' evidence is insufficient to demonstrate the existence of a dangerous condition*

Appellants' evidence fails to raise triable issues of material fact regarding whether the unmarked crosswalk was a dangerous condition. They first cite to letters from community members written in 1976 and 1989, expressing concerns about pedestrian safety at the intersection. They also cite to a pedestrian accident study showing that between July 11, 1998, and June 30, 2003, the intersection at which Ms. Peng was killed was tied for third among all intersections in Oakland in the number of pedestrian-involved accidents. A total of seven accidents had occurred during that time. No information is provided as to the factual circumstances surrounding these accidents. For example, there is no information as to (1) the ratio of pedestrian-involved accidents to successful pedestrian crossings at this intersection during this same time period, (2) whether the pedestrians were utilizing the marked

crosswalks when they were struck, or (3) whether pedestrians were hit by vehicles that were proceeding along 7th Avenue as opposed to along International Boulevard.

As City notes, the accident study was undertaken before the bulb-outs were installed, during a time when the intersection was marked. There also is no evidence in the record that any pedestrians had been struck in the unmarked, bulb-out intersection prior to Ms. Peng. Accordingly, while the study supports an inference that pedestrian accidents could occur at this intersection, it does not support a reasonable inference that the removal of the painted markings increased the risk of such accidents. And while the citizens' letters are relevant to the issue of whether City had notice of a potentially dangerous intersection, they are not competent evidence that the intersection was, in fact, a "dangerous condition" within the meaning of section 835.

Appellants also allege "City staff feared that the design of the intersection which included bulb-outs inviting pedestrian traffic added to the dangerousness of the intersection." This assertion is based on the deposition testimony of city traffic engineer Joe Wang. Appellants misconstrue his testimony. While Mr. Wang indicated that he had expressed a general concern about bulb-outs to the extent they might encourage pedestrians to cross at intersections without traffic controls, this concern did not pertain to the specific intersection at issue here. With respect to the 7th Avenue intersection, he stated: "I think given the pedestrian activities at the corners at the park, we were not able to—we didn't think it would be reasonable to expect people to go elsewhere to cross the street, so that at least at the four corners of the park, where the school is, we will provide bulb-outs to improve pedestrian visibility, crossing safety and so forth."

Finally, appellants point to the declaration provided by their expert witness. In his declaration, the expert asserts "One important effect of a bulb-out is to further invite pedestrians to cross a street where the City has installed a bulb-out, e.g., International Boulevard and 7th Avenue." He also states that "when the City removed the marking from the high usage crosswalk, which [had] been in place for a number of years, it created a foreseeable dangerous condition. This is because pedestrians would continued [sic] to believe they could cross safely at the intersection as if it were marked, while drivers approached that unmarked intersection without anticipating that pedestrians [would] be using it as a crosswalk."

The trial court overruled City's objection to this last statement, noting: "However, the opinion of Plaintiffs' expert that the intersection where decedent was killed was 'dangerous' is insufficient to overcome the immunity provided by Government Code [sections] 830.4 and 830.8." While the issue

of immunity will be discussed further below, we observe that expert opinions on whether a given condition constitutes a dangerous condition of public property are not determinative: "[T]he fact that a witness can be found to opine that such a condition constitutes a significant risk and a dangerous condition does not eliminate this court's statutory task, pursuant to [Government Code] section 830.2, of independently evaluating the circumstances." (*Davis v. City of Pasadena* (1996) 42 Cal.App.4th 701, 705 [50 Cal.Rptr.2d 8].)

Importantly, we note there is no evidence in the record that either Ms. Peng or Jackson had ever crossed at the intersection before it was paved over. Accordingly, the expert's opinion that persons acting in reliance on the formerly painted crosswalk would lessen their vigilance is of limited relevance. This is especially so in light of the fact that the absence of markings would be immediately apparent to sighted pedestrians, even those who had crossed there before the markings were removed.

## C. *The bulb-outs did not create a dangerous condition*

Appellants argue strenuously that the bulb-outs "which invited pedestrians to cross" operated to create a dangerous condition in conjunction with the unmarked crosswalks. They do not argue that bulb-outs themselves increase or intensify the risks associated with crossing a street. In fact, as Mr. Wang noted, bulb-outs may decrease the risk to pedestrians by shortening the distance needed to cross the street, by making pedestrians more visible to motorists, and by calming traffic. Appellants do claim, however, that bulb-outs along with "the traffic pattern on International Boulevard contributed to the danger the intersection posed to pedestrians using the crosswalk with due care."

In *Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434 [6 Cal.Rptr.3d 316] (*Brenner*), the court rejected the theory that the volume and speed of vehicular traffic in combination with heavy pedestrian use created a dangerous condition. In affirming the trial court's sustaining of the city's demurrer, the appellate court noted that the plaintiff had made no allegation that some "physical characteristics" of the street such as "blind corners, obscured sightlines, elevation variances, or any other unusual condition . . . made the road unsafe when used by motorists and pedestrians exercising due care" and that the plaintiff had not cited to any authority "that a dangerous condition exists absent such factors." (*Id.* at pp. 440–441.) *Brenner*, at page 441, relied on *Mittenhuber v. City of Redondo Beach* (1983) 142 Cal.App.3d 1 [190 Cal.Rptr. 694], wherein the court stated: "Many of the streets and highways of this state are heavily used by motorists and bicyclists alike. However, the heavy use of any given paved road alone does not invoke the application of Government Code section 835." (*Id.* at p. 7.)

While it may be that bulb-outs invite heavier pedestrian use, there is nothing about heavy pedestrian use that increased or intensified the danger to Ms. Peng as she attempted to cross the street. The combination of high-speed traffic and heavy pedestrian use alone simply does not lead to public entity liability. (*Brenner, supra,* 113 Cal.App.4th 434, 440–441.) Moreover, the motorist who was traveling in the same direction as Jackson had come to a complete stop prior to Ms. Peng's entering the crosswalk. It thus appears that a reasonably careful motorist would have had no difficulty seeing a pedestrian (or in seeing a car that was stopped for a pedestrian) and stopping, which further supports the conclusion that the configuration of the subject crosswalk did not create a substantial risk of injury when used with due care.

Moreover, appellants do not allege any unusual physical characteristics about the crosswalk where Ms. Peng was killed, such as any visual obstructions which would establish a dangerous condition. For example, appellants did not allege or produce any specific facts describing any particular trees, shrubbery, shadows or insufficient lighting concealing the presence of pedestrians or the crosswalk itself. (Cf. *Washington v. City and County of San Francisco* (1990) 219 Cal.App.3d 1531, 1537–1538 [269 Cal.Rptr. 58] [dangerous condition can be due not only to the absence of regulatory traffic devices, but also because of vision limitations from pillars and shadows].)

■ As the *Chowdhury* court explained, "A four-way stop is not an inherently dangerous condition when used with due care by the general public. The only risk of harm was from a motorist who failed to exercise due care by obeying the de facto stop signs. The City is not liable for that conduct." (*Chowdhury, supra,* 38 Cal.App.4th 1187, 1196.) Here, the only risk of harm was from a motorist who failed to exercise due care by not obeying the Vehicle Code provisions requiring him both to yield to a pedestrian and to refrain from passing around a vehicle that had stopped for a pedestrian. The bulb-outs and the absence of painted markings did not render the intersection dangerous within the meaning of Government Code section 835.[10]

---

[10] Appellants' reliance in their reply brief on *Bonanno, supra,* 30 Cal.4th 139, is also misplaced. In finding that a bus stop constituted a dangerous condition, *Bonanno* assumed that the pedestrian crossing was a dangerous condition. As noted by the court in *Brenner,* "the issue decided in *Bonanno* is the *obverse* of the issue raised by [the plaintiff]: *Bonanno* addressed whether a bus stop was dangerous because of the routes necessarily traveled by its patrons, and in contrast [the plaintiff's] complaint addresses whether the route traveled by patrons was dangerous because of the bus stop. Because *Bonanno* did not address the issue raised by [the plaintiff], and instead assumed the existence of a dangerous crosswalk, *Bonanno* does not illuminate the issues in this case." (*Brenner, supra,* 113 Cal.App.4th 434, 442.)

## D. *Vehicle Code section 21950.5*

It is undisputed that City did not provide the notice of removal of the marked crosswalk as required by Vehicle Code section 21950.5. Appellants' expert offered an opinion that had City complied with this statute, community members would have opposed the removal and City would not have removed the marked crosswalks. This conclusion is speculative.[11] The statute does not require a public agency to take a specific course of action in response to public comment. Thus, as appellants acknowledged at oral argument, had City complied with the statute it would have been free to remove the crosswalk markings even in the face of public opposition.

While appellants contend that Vehicle Code section 21950.5 reflects "a legislative finding that removal of a marked crosswalk may well create a dangerous condition of public property," we agree with City and the trial court that City's failure to comply with the statute's notice and hearing requirements does not support the conclusion that the intersection at issue here was a dangerous condition. Importantly, appellants do not cite to any portion of this statute or its legislative history containing any reference to the statutory scheme governing liability for dangerous conditions of public property.

At oral argument, appellant asserted that Vehicle Code section 21950.5 is "meaningless" if noncompliance does not support a finding of liability. Otherwise, the argument goes, there are no consequences to a public entity that fails to comply with the statute's notice provisions. We are not persuaded.[12]

The sole evidence appellants cite in support of their argument that Vehicle Code section 21950.5 creates liability for Ms. Peng's death is a 47-page study entitled "Dangerous by Design: Pedestrian Safety in California," which appears to be one of several studies included in the materials made available to the Legislature in 2000 when this statute was promulgated. Specifically, appellants draw our attention to the following passage from the study: "According to the California vehicle code, there is a legal crosswalk at every intersection whether it is marked or not. However, very few motorists or pedestrians know this. As a result, motorists often don't expect pedestrians to

---

[11] Evidence that City repainted the crosswalk markings after Ms. Peng's death was deemed inadmissible by the trial court on the ground that it constituted evidence of a subsequent remedial measure.

[12] We observe that neither party raises the issue of whether or not City is liable under section 815.6, which provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

cross at an intersection that isn't marked with a crosswalk, and assume they're jaywalking if they do." This single passage does not cause us to conclude that the Legislature intended to impose personal injury liability on public entities that fail to follow the statutory procedures. Moreover, the legislative committee reports found in the record on appeal do not contain any references to this study. Thus, there is no way to determine the extent to which the Legislature relied on the study in crafting this statute.

■ In our view, Vehicle Code section 21950.5 is not "meaningless." It sets forth a procedure that public entities are required to follow before removing crosswalk markings. That the statute itself does not specify any consequences for noncompliance does not render it superfluous. We disagree with the implication that, absent potential liability for personal injury, public entities and their employees lack incentive to comply with statutory directives. And we note that appellants do not claim City's failure to comply with section 21950.5 in the present case was caused by anything other than inadvertence.

■ In any event, it is well established that courts will not resort to legislative history as an interpretive device where a statute is clear on its face. "[W]hen construing a statute, a court's duty is ' "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted . . . ." ' [Citation.] If there is no ambiguity about the meaning of the language, we must apply the provision according to its terms without further judicial construction. When the language is clear on its face, we may not consider extrinsic evidence to determine the intent of the Legislature. If the language is clear, we follow that plain meaning." (*In re Marriage of Dupre* (2005) 127 Cal.App.4th 1517, 1525–1526 [26 Cal.Rptr.3d 328].)

■ While we do not condone City's failure to comply with Vehicle Code section 21950.5, we find nothing in the language of this provision to suggest that public entities incur liability for injuries sustained by pedestrians who are struck in intersections where crosswalk markings have been removed without the entity first having followed the statutory public notice procedures. Accordingly, we conclude that City's failure to comply with Vehicle Code section 21950.5 does not expose it to liability under Government Code section 835.

E. *City is immune under section 830.8*

■ Appellants' expert also stated in his declaration that "The failure to reinstall this marked crosswalk after one had existed at the intersection for

many years created a trap for a careful pedestrian who might well assume it was safe to cross the intersection and who assumed that cars may still consider the crosswalk to be marked." To the extent appellants' expert opined that the absence of the crosswalk markings created a "trap" for pedestrians, that claim is foreclosed by section 830.8 which immunizes a public entity for liability for accidents proximately caused by its failure to provide a signal, sign, marking, or device to warn of a dangerous condition which endangers the safe movement of traffic unless that condition "would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care." "This 'concealed trap' statute applies to accidents proximately caused when, for example, the public entity fails to post signs warning of a sharp or poorly banked curve ahead on its road or of a hidden intersection behind a promontory [citations], or where a design defect in the roadway causes moisture to freeze and create an icy road surface, a fact known to the public entity but not to unsuspecting motorists [citation], or where road work is being performed on a highway [citation]." (*Chowdhury, supra,* 38 Cal.App.4th 1187, 1197.)

Appellants do not allege the presence of any hazardous condition that would not be apparent to pedestrians and motorists using the intersection with due care. Apart from the lack of a marked crosswalk, the only physical characteristics appellants take issue with are the bulb-outs. The bulb-outs, however, were not hidden from pedestrians or motorists; thus they do not constitute a concealed trap. Accordingly, to the extent the lack of crosswalk markings were a factor in causing the accident, City is immune from liability under section 830.8.

In sum, the trial court properly granted summary judgment to City because there were no triable issues of material fact with respect to the existence of a dangerous condition. A number of courts have found in similar contexts that a dangerous condition did not exist. (E.g., *City of San Diego v. Superior Court, supra,* 137 Cal.App.4th 21 [racing motorist struck another motorist]; *Brenner, supra,* 113 Cal.App.4th 434 [motorist struck pedestrian]; *Antenor v. City of Los Angeles* (1985) 174 Cal.App.3d 477 [220 Cal.Rptr. 181] [motorist struck pedestrians].) As we have concluded that the intersection did not constitute a dangerous condition of public property as a matter of law, and that even if it did City is immune from liability under section 830.8, we do not reach the causation issue raised by City.[13]

---

[13] We agree with appellants that the immunity provided in section 830.4 does not apply to the failure to mark a crosswalk.

## DISPOSITION

The judgment is affirmed.

Marchiano, P. J., and Margulies, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 10, 2008, S167819. Werdegar, J., was of the opinion that the petition should be granted.