Filed 9/26/13  Zuniga v. State of California CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| RICHARD ZUNIGA, JR.,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>STATE OF CALIFORNIA,<br><br>        Defendant and Respondent. | A131971, A133553<br><br>(Contra Costa County<br>Super. Ct. No. C07-02078) |

## I.  INTRODUCTION

While riding in a car driven by Guillermo Najera, [1] appellant Richard Zuniga Jr. was seriously injured when Najera lost control of the car, drove off Highway 4, hit the end of a guardrail, and went down an embankment.  Appellant brought suit against the State of California (Caltrans) for a dangerous condition of public property (Gov. Code, § 835) and Najera for negligence.  After five weeks of trial, the trial judge granted Caltrans' motion for nonsuit/directed verdict on the ground that there was no substantial evidence of a dangerous condition.  Appellant contends the trial court erred in ruling that there was insufficient evidence of a dangerous condition for the issue to be submitted to the jury.  Appellant also contends that CalTrans was not entitled to nonsuit/directed verdict on the basis of design immunity because the as-constructed guardrail failed to conform to design plans and standards.  In a separate appeal, appellant contests an order granting Caltrans expert witness fees.  Finding no error, we will affirm.

---

[1] Guillermo Najera is not a party to this appeal.

1

## II.  FACTUAL AND PROCEDURAL BACKGROUND

On September 19, 2007, appellant filed a complaint in Contra Costa County Superior Court alleging against Caltrans a cause of action for a dangerous condition of public property pursuant to Government Code sections 830 and 835, and against Guillermo Najera for negligence.

Caltrans moved for summary judgment on the ground that the evidence did not raise a triable issue of fact as to the existence of a dangerous condition.  The court denied the motion.

A jury trial commenced on January 18, 2011.

The following evidence was presented at trial:

*The Accident*

On October 21, 2006, at around 2:20 a.m., appellant was a passenger in a car driven by Najera that was involved in a solo crash on eastbound Highway 4, about 0.2 miles east of the McEwen Road underpass.

Prior to the accident, appellant and Najera had been on Franklin Canyon Road near the Port Costa/McEwen Road exit off Highway 4 in Martinez where people were street racing.  The police arrived at the scene and the cars scattered.  Najera and Zuniga returned to the same spot on Franklin Canyon Road.  Najera raced once; Zuniga was not in the car at the time.  They both got in the car and left; Zuniga was in the passenger seat wearing his seat belt.

Najera was driving his black 2005 Mustang GT with a 300-horsepower V8 engine.  On the McEwen Road on-ramp to eastbound Highway 4, Najera dramatically increased his speed, accelerating fast enough that each time he shifted gears appellant was "slammed" into the back of the seat.  The Mustang did not have its headlights on; only the fog lights were illuminated.

Benjamin Hoyles, who was 20 years old at the time, was at the street racing event with appellant and Najera.  Hoyles went up the on-ramp to Highway 4 ahead of Najera and was traveling about 95 miles per hour in the number two lane.  He saw the Mustang in his driver's side mirror, catching up; the Mustang was in the number one lane.  Hoyles'

2

passenger yelled, "Deer," and Hoyles saw something go past his window. In his side mirror, he saw the Mustang swerve and then go off the road.

Appellant also saw the deer on the highway and yelled. Najera hit the brakes, swerved to the right, crossed the number two lane, and struck the last 20 feet of a stretch of guardrail, which bent and broke away upon impact as designed.

The Mustang moved along the guardrail and then left the roadway at a nine-degree angle, traveling across a flat, sandy dirt plateau adjacent to Highway 4. After smashing through the guardrail, the Mustang was still traveling at a high rate of speed. The accident reconstructionist for Caltrans, Ted Kobayashi, testified that, after leaving the guardrail, the Mustang was traveling between 66 and 88 miles per hour. Appellant's accident reconstructionist, Thomas Shelton, testified that the Mustang left the guardrail traveling between 59 and 85 miles per hour.

At the end of the plateau, more than 200 feet from where the Mustang hit the guardrail, it encountered a slope that descended at a 5.5:1 ratio, meaning that it dropped one foot in height for every five and a half feet of horizontal distance. At the hinge point, where the elevation changed from flat to a down slope, the Mustang went airborne. The Mustang struck the ground and then rolled over at least three times.

California Highway Patrol (CHP) Officers Brian Elledge and Peter Arpaia responded to the accident. The Mustang was at the bottom of the slope, approximately 174 feet beyond the hinge point. Neither officer detected any odor of alcohol from either occupant.

Appellant had a brief memory of being in the car after the accident, but did not remember anything else until about two weeks later. On the night of the accident, appellant told a paramedic that the vehicle was going about 110 miles per hour. He later told a CHP officer he thought they were going over 100 miles per hour. He acknowledged that he could not see the speedometer from where he was sitting; he based his estimate on the fact that they were going fast.

3

*The Location*

The accident occurred on Highway 4, east of the McEwen Road on-ramp. The highway in that area is flat and straight with no curves, and has no sight obstructions. The highway was dry at the time of the accident. There were two eastbound lanes, each 12 feet wide, and an eight foot asphalt shoulder. The guardrail was immediately adjacent to the asphalt shoulder. The speed limit was 65 miles per hour.

The Mustang left the roadway and hit the eastern end of a stretch of guardrail. That section of guardrail was 888 feet long and began just to the east of the McEwen Road on-ramp (Location 1). To the east of that section of guardrail, there was a 211-foot space with no guardrail, i.e., a gap, along the edge of the shoulder before another section of guardrail, 302 feet long (Location 2), began. The off-road area adjacent to the gap was flat terrain; the ground sloped away from the plateau in different spots, including a fire road or trail with loose sandy soil toward the east. It was over this fire road or trail that the Mustang launched.

Officer Arpaia was assigned to investigate the accident. He found no skid marks or other evidence on the roadway. The last 20 feet of Location 1 was bent back and damaged. There was black paint on the damaged guardrail and the Mustang showed guardrail markings on the passenger side from front to back. Tire marks in the dirt along flat terrain adjacent to the gap in the guardrails led generally from the damaged guardrail to a point where a slope began. At that point, the tire marks stopped. There was a large gouge in the dirt some distance down the slope; there were no tire marks leading to the gouge.

The Mustang was located further down the slope, at the foot of an embankment. There was evidence the vehicle had rolled over, including damage to the vehicle and vehicle debris on the slope.

Shelton, appellant's accident reconstructionist, concluded that the Mustang struck the last 20 feet of the guardrail at Location 1 and left the roadway at a nine-degree angle. It traversed the dirt plateau until it reached the point where the elevation changed from relatively flat to a downgrade of about 18 percent. The Mustang went airborne, then

4

struck the ground at the gouge mark, and then rolled over at least three times. Shelton estimated the Mustang's speed when it left the roadway as between 59 and 85 miles per hour.

*Placement of the Guardrail*

The Caltrans Traffic Manual includes standards and design details for traffic safety systems. The Traffic Manual provides that "[a]n area clear of fixed objects adjacent to the roadway is desirable to provide a recovery zone for vehicles that have left the traveled way." A clear width of at least nine meters (29.5 feet) adjacent to freeways and high-speed expressways (operating speeds greater than 70 km/h) permits about 80 percent of vehicles that leave the roadway out of control to recover. Such an area is referred to as a clear recovery zone. A clear recovery zone should be kept free of hazards such as fixed objects, which would include a guardrail. At the 211-foot gap between Location 1 and Location 2, there is a clear width of up to 57.5 feet (17.5 meters). Caltrans intended that this plateau with dirt and vegetation adjacent to the highway function as a clear recovery zone.

The Traffic Manual also addresses guardrail, a traffic safety system installed in certain circumstances "to reduce the severity of run-off-road accidents . . . by redirecting a vehicle away from embankment slopes or fixed objects and dissipating the energy of the errant vehicle. However, guardrail will reduce accident severity only for those conditions where striking the guardrail is less severe than going down an embankment or striking a fixed object. Guardrail should only be installed where it is clear that accident severity will be reduced."

The decision whether to install guardrail is discretionary. For embankment guardrail, the decision is based on a consideration of (1) accident history and potential; and (2) the Equal Severity Curve, which represents the relative severity of going off the embankment versus hitting the guardrail. An evaluation of the potential frequency of accidents at the location is based on roadway alignment, the volume of traffic, the size of the roadside recovery area, and climatic conditions. Figure 7-1 in the Traffic Manual shows the Equal Severity Curve, a line that represents combinations of embankment

5

height and slope that result in accident severities generally equal to average guardrail accident severity. In general, accident severity will be less if guardrail is used on embankments that plot substantially above the line. The Equal Severity Curve also illustrates that for slopes with a horizontal to vertical ratio of greater than 3:1, i.e., that descend one foot vertically for every three or more feet horizontally, hitting the guardrail is always considered more severe. Phrased another way, embankment guardrail is not indicated for embankment flatter than 3:1.

In August 1999, the CHP notified Caltrans that there had been accidents involving vehicles running off the road and over embankments in the area of Highway 4 east of McEwen Road. Lynn Miller, a senior engineer in the Caltrans traffic branch, assigned traffic engineer Harold Barnell to investigate. Barnell reviewed the accident reports and found that, between 1994 and 1998, over the 2.3 mile stretch of eastbound Highway 4 from post-mile 5.37 to 7.67, there had been 18 accidents that resulted in nine injuries and two fatalities. Barnell inspected the relevant area of Highway 4, and recommended placing four sections of guardrail based on his opinion that the embankment slopes at these locations were hazardous.

The first section of guardrail, Location 1, was designed to be 272.27 meters long; as constructed, it measured 270.66 meters (888 feet). The second section, Location 2, was designed to be 93.4 meters; as constructed it measured 92.05 meters (302 feet). The gap in between as constructed measured 211 feet.

Following construction of the guardrail project in 2000, more than 50 million vehicles traveled eastbound Highway 4 past the 211-foot clear recovery zone between the guardrails without a single over-embankment accident prior to the accident involving appellant.

At trial, appellant compared a survey of the accident site to the design plans to show that the as-constructed guardrail differed from the design plans in two respects. The survey included a station whose zero point was a call-box. First, according to appellant, as constructed, the Location 2 guardrail commenced 73.5 feet further east than was indicated on the plans. Second, because Location 2 was over 70 feet further east, the

6

gap between Locations 1 and 2 was over 70 feet longer than designed.  Appellant presented evidence that, as designed, the gap should have been approximately 135 feet, not 211 feet.

Caltrans expert Kenneth Berner measured the height and slope of the embankment at four points.  He concluded that, moving eastward along Location 2, the equal severity curve criteria for placement of guardrail were first met at a point located 65.5 feet east of the beginning of Location 2.  Berner opined that, based on equal severity curve analysis, the Location 1 and Location 2 guardrail were located appropriately.

Appellant's expert, Maurice Bronstad, agreed that the equal severity curve is one of the criteria for placing guardrail, but he testified that the length of guardrail required is determined by traffic volume and departure angles, i.e., the angles at which vehicles depart the roadway or "runoffs."  Bronstad did equal severity curve and runoff analyses, and determined that, for vehicles leaving the roadway at an angle of nine degrees or more, there were a number of possible paths through the 211-foot gap that would lead the vehicle into nontraversable area.  Bronstad opined that the clear recovery zone was not safe because it allowed access to nontraversable slope behind the guardrail.  He concluded that Location 2 should have been extended an additional 90 feet to the west, which would have reduced the gap to 121 feet.  Based on the statement in the Traffic Manual that "[g]aps of less than 60 m[eters] between guardrail installations . . . should be avoided," Bronstad further opined that, since the gap should have been less than 60 meters, it should have been closed with continuous guardrail.

*Proceedings Following the Close of Evidence*

At the close of the evidence, the court considered Caltrans' motion for nonsuit and/or directed verdict pursuant to Code of Civil Procedure section 630, subdivision (a). The trial court articulated its understanding of the pertinent inquiry: that, in order to establish a dangerous condition, a plaintiff must show a substantial risk of injury; a "remote possibility of harm" does not constitute a substantial risk; and evidence of an absence of similar accidents "constitutes a valid basis for the court to find that the property was not in a dangerous condition . . . ."

The court observed that it was undisputed that 50 million eastbound vehicles had passed the accident location in the six years from the time the guardrail was installed in 2000 until the subject accident occurred in 2006, and yet there had been no other accidents at that location. It concluded that, under the case law, because of the absence of other accidents, "the only conclusion reasonable men could draw is that the specific location where this accident occurred did not constitute a dangerous condition for drivers exercising due care." "Injury to one person out of 50 million," it stated, "does not constitute a substantial risk to foreseeable users."

The court further concluded that appellant's expert's testimony was insufficient to create an issue of fact. Accordingly, the court granted the motion for nonsuit/directed verdict on the ground that appellant had failed to present sufficient evidence of a dangerous condition.

On May 10, 2011, appellant filed a timely notice of appeal from the order granting the motion and from the judgment, case No. A131971.

On September 6, 2011, the trial court entered a costs order granting Caltrans expert witness fees of $125,504.88. On October 21, 2011, appellant filed a separate notice of appeal challenging the costs order, case No. A133553.

On February 8, 2012, this court consolidated the two appeals.

### III. DISCUSSION

A.      *Standard of Review.*

An appellate court reviews both a directed verdict and a judgment of nonsuit de novo, applying the same standards that govern the trial court. (*Magic Kitchen LLC v. Good Things International Ltd*. (2007) 153 Cal.App.4th 1144, 1154 [directed verdict]; *Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541-1542 (*Saunders*) [nonsuit].) This requires that we view the evidence in the light most favorable to appellant, and resolve all conflicts and draw all legitimate inferences in appellant's favor. (*Woods v. Union Pacific Railroad Co*. (2008) 162 Cal.App.4th 571, 576; *Saunders*, *supra*, 42 Cal.App.4th at p. 1541.) "If there is substantial evidence to support [appellant's] claim, *and* if the state of

8

the law also supports that claim, we must reverse the judgment. [Citation.]" (*Margolin v. Shemaria* (2000) 85 Cal.App.4th 891, 895 (*Margolin*).)

B.      *Dangerous Condition of Public Property*.

        1.      *Legal Principles*.

A public entity in California is not liable in tort except as specifically provided by statute. (Gov. Code, § 815[2]; *Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 829 (*Brown*).)

Section 835 sets forth the exclusive conditions under which a public entity may be liable for injuries caused by a dangerous condition of public property. (*Brown*, *supra*, 4 Cal.4th at p. 829.) It provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

A "dangerous condition" is defined as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (§ 830, subd. (a); *Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 147 (*Bonanno*).) "Section 830.2 provides a qualification to the definition of a dangerous condition of public property, by stating: 'A condition is not a dangerous condition within the meaning of this chapter if the trial or appellate court, viewing the evidence most favorably to the plaintiff,

---

[2] All further unspecified statutory references are to the Government Code.

determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used.' " (*Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 233-234 (*Sambrano*), italics omitted.)

The existence of a dangerous condition is usually a question of fact, but the issue may be resolved as a matter of law if reasonable minds could come to only one conclusion. (§ 830.2; *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1133; *Bonanno*, *supra*, 30 Cal.4th at p. 148; *City of San Diego v. Superior Court* (2006) 137 Cal.App.4th 21, 28.)

2.      *Analysis.*

Appellant's theory at trial was that "a dangerous condition existed because (a) the slope the Mustang went over posed a substantial risk of injury to persons using the roadway with due care and (b) the gap in the guardrail permitted the Mustang to gain access [to] that slope." The trial court granted a directed verdict on the basis that the evidence established there was no dangerous condition as a matter of law. Appellant's task on appeal is to identify substantial evidence in the record to support the claim that the accident location constituted a dangerous condition, and to further demonstrate that the state of the law supports that claim. (*Margolin*, *supra*, 85 Cal.App.4th at p. 895; *Salas v. California Dept. of Transportation* (2011) 198 Cal.App.4th 1058, 1067-1070.)

"Whether the condition of property posed a substantial risk of injury to foreseeable users exercising due care is an objective standard and is measured by the risk posed to an ordinary foreseeable user." (*Huffman v. City of Poway* (2000) 84 Cal.App.4th 975, 992.) The substantiality of the risk addresses the likelihood that an injury will occur, not the extent of any such injury. (*Fredette v. City of Long Beach* (1986) 187 Cal.App.3d 122, 130, fn. 5 (*Fredette*).) A remote possibility of harm is not a substantial risk. (*Ibid*.)

"Property is not 'dangerous' within the meaning of the statutory scheme if the property is safe when used with due care and the risk of harm is created only when

10

foreseeable users fail to exercise due care." (*Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434, 439.) "[A] public entity is only required to maintain its property in a way that is safe for 'careful use.' [Citation.] 'Although public entities may be held liable for injuries occurring to reasonably foreseeable users of . . . property . . . liability may ensue only if the property creates a substantial risk of injury when it is used with due care.' [Citation.] After all, 'any property can be dangerous if used in a sufficiently abnormal manner.' [Citation.]" (*Milligan v. Golden Gate Bridge Highway and Transportation Dist.* (2004) 120 Cal.App.4th 1, 6-7; *Schonfeldt v. State of California* (1998) 61 Cal.App.4th 1462, 1466 [" '[A] public entity is only required to provide roads that are safe for reasonably foreseeable *careful* use.' [Citations.]"].)

We consider a number of factors in determining whether, as a matter of law, a condition creates only a minor risk of harm, as opposed to a substantial risk, under section 830.2. "The court should consider both the physical description of the condition, and 'whether there existed any circumstances surrounding the accident which might have rendered the defect more dangerous than its mere abstract [description] would indicate.' [Citation.] Where appropriate, the court should consider not only the intrinsic nature and quality of the condition, but also other factors such as the time and place of the occurrence. [Citation.] 'Furthermore, the court should see if there is any evidence that other persons have been injured on this same defect.' [(*Fielder v. City of Glendale* (1977) 71 Cal.App.3d 719, 734 (*Fielder*).)]" (*Sambrano*, *supra*, 94 Cal.App.4th at p. 234.) Whether there have been similar accidents at the site is relevant to determining whether the asserted dangerous condition presents a substantial risk of harm. (*Sambrano v. City of San Diego*, *supra*, 94 Cal.App.4th at p. 243; *McKray v. State of California* (1977) 74 Cal.App.3d 59, 62-63.)

Viewing the evidence in the light most favorable to appellant, including (1) the various possible reasons why a vehicle might leave the roadway, (2) crediting appellant's contention at oral argument that, depending on the circumstances, driving in excess of the speed limit is not always or necessarily using the roadway without due care, and (3) that the slope was variously described as "a steep downgrade" and a "steep slope" by

11

Sergeant Arpaia and a "steep embankment" by Joel Hornstein, a paramedic who responded to the scene of the accident. We nevertheless conclude, as a matter of law, that the slope down which the Mustang traveled and the gap in the guardrail through which the Mustang accessed that slope did not present a substantial risk of harm when the adjacent stretch of Highway 4 was used with due care.

The Mustang hit the last 20 feet of the Location 1 guardrail, traveled into the clear recovery zone, traversed the length of the gap, i.e., more than 200 feet, then continued past the clear recovery zone, behind the Location 2 guardrail, and went airborne at the hinge point of a long slope that descended at a 5.5:1 ratio. As we have stated, this portion of Highway 4 is flat and straight with no curves, and has no sight obstructions. The guardrails were installed to prevent vehicles from running off the road and encountering embankment that would likely cause a more severe accident than would result from hitting the guardrail itself. The gap in the guardrail provides access to a clear recovery zone that was flat, sandy dirt terrain, not sloping, and exceeded by up to 28 feet the recommended minimum width of 29.5 feet, i.e., it was up to twice as wide as required by the Traffic Manual. The evidence was uncontradicted that a clear recovery zone of the minimum width allows about 80 percent of vehicles leaving the roadway to recover. Using the equal severity curve, based on the relative severity of going down the slope traveled by the Mustang (or any slope that descends at a ratio greater than 3:1) versus hitting guardrail, the Traffic Manual indicates that striking the guardrail would be more severe. Thus, guardrail is not indicated for this particular slope. Caltrans also presented uncontradicted evidence that, in the six years after construction of the guardrail project in 2000, more than 50 million vehicles traveled eastbound Highway 4 past the Location 1 and Location 1 guardrails, the 211-foot gap between the guardrails, and the clear recovery zone without a single accident prior to the accident involving appellant. Based on the physical characteristics of the roadway and adjacent area, the absence of aggravating factors that could have made the condition more dangerous, and the complete absence of other accidents since construction of the guardrail, we find no dangerous condition as a matter of law.

Appellant's first argument, which he presents at length in his opening brief, is one about which the parties do not disagree:  namely, that expert opinion evidence *may* constitute substantial evidence of a dangerous condition.  However, we disagree with appellant that the trial court erroneously ruled to the contrary, i.e., that expert opinion testimony categorically cannot constitute substantial evidence.  The transcript of the ruling makes clear the court's reasoning that the existence of expert testimony, by itself, does not necessarily create a triable issue of fact, independent of its value and the existence of supporting facts.

The consideration of expert opinion evidence in *Song X. Sun v. City of Oakland* (2008) 166 Cal.App.4th 1177 (*Sun*), by our colleagues in Division One of this court is instructive.  In *Sun*, the appellants' expert witness asserted that the city created a dangerous condition at the intersection where the decedent was killed.  (*Id.* at p. 1188.)  The court observed that "expert opinions on whether a given condition constitutes a dangerous condition of public property are not determinative:  '[T]he fact that a witness can be found to opine that such a condition constitutes a significant risk and a dangerous condition does not eliminate this court's statutory task, pursuant to [Government Code] section 830.2, of independently evaluating the circumstances.'  (*Davis v. City of Pasadena* (1996) 42 Cal.App.4th 701, 705.)"  (*Sun*, *supra*, 166 Cal.App.4th at p. 1189.)  The court went on to evaluate the expert's opinion, including consideration of his reasoning and factual support, and found it did not rise to the level of substantial evidence.  (*Ibid.*)

Appellant contends that Bronstad's testimony, based on his analyses, constituted sufficient evidence of a dangerous condition and that the trial court erred in ruling that it did not.  Specifically, appellant relies on Bronstad's testimony that the gap in the guardrail permitted a vehicle exiting the roadway to gain access to hazardous area, that Location 2 should have been extended an additional 90 feet to the west, which would have reduced the gap's length to less than 60 meters, and that consequently the gap should have been closed.  Further, Bronstad testified that the guardrail failed to comply with the Caltrans Traffic Manual.

13

The sum-total of appellant's argument on this point in his opening brief is citation to a practice guide and two cases, *Cameron v. State of California* (1972) 7 Cal.3d 318 (*Cameron*) and *Curreri v. City and County of San Francisco* (1968) 262 Cal.App.2d 603 (*Curreri*). In *Cameron*, the plaintiffs were injured when the car in which they were riding went off the road and crashed after encountering a sharp "S" curve on a steep downgrade on Highway 9 in Santa Cruz County. The Supreme Court reversed a nonsuit, finding that the testimony of a civil engineer that the superelevation (banking) on the curve was not consistent, but changed abruptly, and that the abrupt change would tend to shift the weight of the car so as to lift one wheel off the ground and make the car roll was "sufficient evidence to uphold a jury finding that the uneven superelevation in the 'S' curve without warning signs constituted a dangerous condition." (*Cameron*, *supra*, 7 Cal.3d at pp. 323-324.) In *Curreri*, a driver attempting to pull out of a right-angle parking spot on a steep hill stepped on the accelerator instead of the brake, causing the car to move forward over the two- to three-inch curb and the sidewalk and hit the plaintiff, who was sitting on the front steps of a flat. (262 Cal.App.2d at p. 605.) The court concluded that the standard specification for six-inch curb height was a safety requirement and one factor among many circumstances that together created a dangerous parking situation in San Francisco. Here, based on our independent evaluation of the circumstances, there is no evidence that the gap and the slope presented a substantial risk of injury, as opposed to a minor or insignificant risk, to a reasonably careful motorist.

Moreover, Bronstad's opinion that the guardrails were not constructed in compliance with the Traffic Manual does not constitute substantial evidence of a dangerous condition because the evidence "must establish a physical deficiency in the property itself" that creates a substantial risk of injury when used with due care. (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1347-1348; *Mixon v. State of California* (2012) 207 Cal.App.4th 124, 131.) Although evidence that applicable safety standards were not followed may be relevant in an appropriate case on the question of a dangerous condition (Van Alstyne et al., Cal. Government Tort Liability Practice (Cont.Ed.Bar

14

2011) § 12.20E, p. 888.1), this is not such a case because of the absence of evidence that the asserted dangerous condition posed a substantial risk.

Appellant also cites, as substantial evidence of a dangerous condition, witness descriptions of the slope the Mustang went down as "steep;" witness testimony that they could not drive down that slope; and the fact that the Mustang went airborne. Again, however, none of this evidence establishes a *substantial* risk of injury to members of the public exercising due care, particularly bearing in mind the speed of the Mustang when appellant spotted the deer.[3] There simply is no evidence of the probability or likelihood of a motorist exercising due care running off the road and into the gap and being unable to stop or sufficiently slow down in the clear recovery zone.

Appellant contends it was "undisputed that a person driving reasonably might nevertheless go off the roadway at freeway speed due to a mechanical problem or to avoid an animal, another vehicle, or an object dropped onto the roadway." Appellant also points out evidence that the Mustang suffered a serious rollover accident despite leaving the roadway at a speed possibly as low as 59 miles per hour. We acknowledge that, although it is possible for a vehicle to go off the highway for any of the reasons appellant suggests, travel through the gap in the guardrail, and continue across the clear recovery zone and beyond, it is an unlikely occurrence and does not amount to a substantial risk of harm. A holding that this possibility rendered the gap dangerous would amount to requiring Caltrans to insure against injuries arising from trivial defects or remote risks on state roadways, contrary to the public policy underlying the Tort Claims Act (§ 810 et seq.) (See *Fielder*, *supra*, 71 Cal.App.3d at p. 734.) In *Curreri*, *supra*, 262 Cal.App.2d at page 610, the court recognized that the city "has no duty to provide curbs or other protective features throughout the City which would in all cases prevent negligent

---

[3] We note that a plaintiff need not prove the property was actually being used with due care at the time of the accident and that a third party's negligence will not relieve a public entity of liability for a dangerous condition of public property. (See, e.g., *Ducey v. Argo Sales Co*. (1979) 25 Cal.3d 707, 718-719; *Huffman v. City of Poway, supra,* 84 Cal.App.4th at p. 992; *Fredette*, *supra*, 187 Cal.App.3d at p. 131.)

motorists from driving from the street onto the sidewalk and damaging property or injuring persons." However, the court acknowledged that a combination of circumstances can exist such that a public entity has a duty to take greater protective measures. (*Curreri*, *supra*, 262 Cal.App.2d at p. 611.) There is no such combination of circumstances here.

Finally, appellant contends that the evidence of accidents in the 2.3 mile vicinity of the accident site *prior* to installation of the guardrail, in addition to the evidence of guardrail strikes *after* its installation, viewed in the light most favorable to appellant, supports the existence of a dangerous condition. We disagree. Appellant cites *Hurley v. County of Sonoma* (1984) 158 Cal.App.3d 281, 286, for the proposition that evidence of similar accidents in the general vicinity can support the existence of a dangerous condition. However, the court in *Hurley* was stating the general rule that other accidents in the vicinity may constitute such evidence if they occurred "under the same or similar circumstances." (*Id*. at p. 286.) Here, there is no evidence that the prior accidents involved similar circumstances or were otherwise sufficiently similar. Moreover, the physical condition of the general vicinity here changed when the guardrail was installed in 2000 to address the run-off-road accidents brought to Caltrans' attention by the CHP. The only reasonable inference that can be drawn from the absence of accidents after its installation is that the guardrail was effective in improving the safety of this stretch of Highway 4. The guardrail strikes further support the inference that the guardrail was functioning as intended. The absence of prior similar accidents after installation of the guardrail, especially in light of traffic volume of 50 million vehicles, is highly probative of the lack of dangerousness.

In his reply brief, appellant expands on his arguments that the Location 2 guardrail should have been anywhere from 20 to 90 feet longer and that the gap should have been closed. Bronstad testified to the effect that "[i]f a vehicle can get behind the guardrail to the hazardous embankment, . . . 'then you haven't made the guardrail long enough.' " The parties argue points such as the length of guardrail that should precede an area of concern behind the guardrail; whether certain provisions of the Traffic Manual apply to

embankment guardrail or fixed object guardrail or both; and whether the Traffic Manual requires that departure angles be taken into account in determining the appropriate length of guardrail.  None of these arguments has bearing on the point we find dispositive: the absence of any evidence that the risk of injury posed by the gap/slope was substantial within the meaning of the statute.

C.    *Design Immunity*.

In light of our conclusion that the gap/slope did not constitute a dangerous condition of public property, we need not address the affirmative defense of design immunity.

D.    *The Costs Award*.

The award of costs to Caltrans was dependent on the outcome of the dangerous condition issue.  In light of our conclusion that the gap/slope was not a dangerous condition as a matter of law, we will not disturb the costs award.

## IV.  DISPOSITION

The judgment and the order awarding costs are affirmed.


_____
Haerle, J.


We concur:


_____
Kline, P.J.


_____
Richman, J.


17