Filed 1/27/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DESTINY THIMON, a Minor, etc.,<br>    Plaintiff and Appellant,<br><br>v.<br>CITY OF NEWARK,<br>    Defendant and Respondent. | A152093<br>(Alameda County Super.<br> Ct. No. HG15756417) |

Destiny Thimon, then 14 years old, was crossing Cherry Street in Newark, California one morning when she was hit by a car driven by Bihn Soudachanh, who did not see her because the sun was in his eyes.  Thimon was seriously injured as a result.

Through her guardian ad litem, Thimon sued the City of Newark (Newark), asserting that a variety of alleged defects in the intersection and its surrounds rendered it a dangerous condition that partially caused the accident.  Newark filed a motion for summary judgment contending, among other things, that the intersection did not constitute a dangerous condition and that Thimon could not show it was a dangerous condition.  The trial court granted summary judgment on these grounds and entered judgment in favor of Newark.  Thimon timely appealed.  We affirm.[1]

---

[1] Newark has filed a cross-appeal contesting the trial court's rejection of Newark's argument that it was also entitled to summary judgment based on its affirmative defense of design immunity.  This cross-appeal is dismissed as moot because of our affirmance of the trial court's grant of summary judgment.  We therefore do not further address this issue.

# BACKGROUND

## I.

### *Thimon's Allegations*

Thimon's second amended complaint, the operative pleading (the complaint), alleges: "On December 6, 2013 at approximately 7:30 in the morning, Destiny Thimon was on her way to school, and reached the corner of Cherry Street and Redeker Place. As Cherry Street at this intersection was not controlled by signals or stop signs, and contained no pedestrian activated signals or lights, [Thimon] waited for traffic to abate before proceeding. After being in the crosswalk approximately 6.22 seconds, she was struck by a vehicle traveling on Cherry Street, was thrown over 50 feet by the impact, and suffered, *inter alia*, a major head injury, fracture of her femur, and facial fractures. The operator of the offending vehicle was driving at a rate under the 45 mph posted speed limit but had not seen [Thimon] due to glare from the morning sun."

Under Thimon's claim against Newark for "Dangerous Condition of Public Property," the complaint further alleges: "Cherry Street at its intersection with Redeker Place is a public street owned and/or controlled by [Newark]. It consists of two lanes for travel in both directions with two left turn pockets, one for entrance into Redeker Place and the other for entrance onto Robertson Avenue." It further alleges that Cherry Street at this intersection lacked "stop signs," "traffic signals," a "blinking yellow arterial to warn drivers of the impending crosswalk" and "pedestrian actuated mechanisms to alert a driver of a pedestrian's use of the crosswalk." This area "thereby constitutes a dangerous condition of public property," the complaint further alleges, "due to forced use of an unprotected, uncontrolled crosswalk particularly at a time of year and time of day when glare from the morning sun obscures visibility of pedestrians." This condition "created a trap for pedestrians," and Newark "should have ameliorated the hazards presented by its location [more than 4 lanes of width with morning commute traffic traveling at 45 mph with visibility obscured by morning sun] by implementation of, *e.g.*, warning lights or pedestrian actuated mechanisms."

The complaint also alleges that Newark created the dangerous condition by "failing to continue sidewalk along Cherry Street, placing a crosswalk at that intersection, painting only single white lines, omitting traffic controls on Cherry Street, omitting arterial warning signals, and/or omitting pedestrian actuated signals for use of the crosswalk. Alternatively, the danger existed for a sufficient period of time before the accident to have permitted its employees, in the exercise of due care, to discover and remedy the dangerous condition existing by reason of [these features or lack of features]."[2]

The complaint further asserts that as a "legal result" of this dangerous condition, Thimon was violently struck by a vehicle traveling below the posted speed limit while she was legally in the crosswalk, was injured and subjected to great mental and physical suffering, was required to obtain health care and rehabilitation, requires attendant care services and may be unable to work in the future or will sustain a loss of earning capacity.

## II.

### *Newark's Summary Judgment Motion*

Newark moved for summary judgment, including on the ground that Thimon could not establish a defect in the property constituting a dangerous condition. Thimon opposed summary judgment, including on the ground that Newark had not met its burden of negating the dangerous condition because it had "segregate[d] each aspect of this crosswalk" but failed to "attack[] the combination of circumstances which made this

---

[2] The complaint also alleges as a dangerous condition that "the [west] side of Cherry Street after Redecker Place from which [Thimon] was coming is an industrial area which contains no sidewalk. The other side of Cherry Street had a sidewalk. Pedestrians coming from [Thimon's] residence, particularly students attending school at . . . Newark Memorial High School, must cross Cherry Street at this intersection due to the absence of continuing sidewalk on Cherry Street." Thimon has abandoned reliance on this condition, presumably because Newark thoroughly discredited its dangerousness below, pointing out that the sidewalk on the west side of Cherry ended at an earlier point and would have forced Thimon, if anything, to use the signalized intersection at Central Avenue before she reached Cherry. Nor has she pursued her theory that a bus stop on the east side of Cherry contributed to the intersection's dangerousness.

3

marked crosswalk a dangerous condition"; and that the installation of a crosswalk at the Cherry/Redeker intersection created a dangerous condition.

## A. The Undisputed Facts

The following facts are undisputed. The intersection where the accident occurred is on a two-way, four-lane (with an additional turning lane in the center) arterial street known as Cherry Street that runs generally northwest-to-southeast (which for ease of description we will refer to as north-south), where it intersects with two streets known as Redeker Place (on the west) and Robertson Avenue (on the east) (which for ease of description we will refer to as the Cherry/Redeker intersection). Cherry, Redeker and Robertson were constructed sometime prior to 1963. Improvements that involved widening the intersection and installing sidewalk on the east side of Cherry were constructed in 1964 and 1981. There was no marked crosswalk at the Cherry/Redeker intersection until 1998, when Newark marked the crosswalk with white lines and installed warning signs on both sides of Cherry approaching the intersection. In 2003, after resurfacing the road, Newark again marked the crosswalk with white lines.

The Cherry/Redeker intersection is controlled by stop signs on Redeker and Robertson, which require vehicles to stop before entering onto Cherry, but there are no stop signs or traffic lights on Cherry itself at this location. At other locations, there are signalized intersections where pedestrians may cross Cherry, but at the Cherry/Redeker intersection there is simply a crosswalk with painted white lines running east-west across Cherry. Besides the painted crosswalk lines, there are signs, two south of the intersection about 140 and 560 feet away and two north of the intersection similar distances away, warning oncoming motorists of the pedestrian crosswalk at the intersection.

In the area of the intersection, Cherry Street is a level roadway with no blind corners or other physical features (such as foliage or elevation variances) that might obscure motorists' vision of the crosswalk. A pedestrian sidewalk runs along the east side of the street, but generally not on the west (industrial) side. During certain times of year, the light from the rising sun creates a glare that can obscure the vision of motorists

4

traveling southward on Cherry in the vicinity of the intersection at certain times of the morning.

There is heavy motor traffic along Cherry Street. By contrast, there is low pedestrian usage of the Cherry/Redeker intersection. In the 10-year period preceding the accident, there were no reports of motorists on Cherry Street colliding with pedestrians using the crosswalk at the Cherry/Redeker intersection.

On the morning of December 6, 2013, at about 7:30 a.m., Thimon walked from her home to school. Along her route to the Cherry/Redeker intersection were two opportunities to cross Cherry at crosswalks with traffic signals (at Thornton and at Central). There was also an intersection with signals (at Mowry) beyond the Cherry/Redeker intersection in the direction she was walking. Thimon was on the west side of Cherry when she stopped at Redeker to cross Cherry. Traffic on Cherry was still heavy and flowing as she began to cross Cherry in an eastward direction in the crosswalk.

Around this same time, Soudachanh, driving his usual route to work, turned from Central Street right onto Cherry and proceeded southward approaching the Cherry/Redeker intersection. When he pulled out from behind a bus into the left-hand lane, his vision was obscured by the glare of the sun, which he had previously experienced at this location during certain fall and winter months. He put his visor down but was still unable to see anything in front of him. He nonetheless proceeded to drive through the intersection, colliding with Thimon, whom he did not see at any time before he hit her. She was thrown more than 50 feet and suffered serious injuries. Soudachanh violated the Vehicle Code by driving at a speed greater than was reasonable having due regard for visibility on the roadway (*id.*, § 22350) and failing to yield the right of way to a pedestrian crossing the roadway within any crosswalk at an intersection (*id.*, § 21950). There is no dispute that his negligent driving was a proximate cause of Thimon's injury.[3]

---

[3] There was a dispute about the precise speed at which Soudachahn was driving at the time of the incident in this 45 miles per hour zone. He told police and testified at deposition that he was driving 20 to 25 miles per hour. Police estimated, based on the location where Thimon's head struck Soudachanh's windshield and a computer program

**B. Disputed Issues**

The parties disputed the condition of the Cherry/Redeker intersection, based mostly on declarations by their respective experts. Newark's traffic and civil engineering expert opined that the various features of the intersection that Thimon alleged made it dangerous did not increase the risk to pedestrians or were reasonable exercises of engineering judgment. In particular, he opined that the decisions to mark the crosswalk in 1998 and to re-mark it in 2003 were "reasonable exercise[s] of engineering judgment."

Newark's expert also attached to his declaration a copy of a study by a traffic engineering consulting firm that Newark retained shortly after the collision to evaluate whether installation of traffic signals was warranted under the criteria contained in the California Manual on Uniform Traffic Control Devices. The expert agreed with the finding of the study that a traffic signal was not warranted based on those criteria.

Thimon proffered the declaration of her own engineering expert, who disagreed that installing the crosswalk at the Cherry/Redeker intersection was reasonable. He opined that studies indicate pedestrian accidents increase significantly in marked as opposed to unmarked crosswalks on high speed, heavily trafficked arterials. While he acknowledged that crosswalks "can provide increased safety for pedestrians under suitable conditions," he opined that a public entity cannot evaluate whether conditions are suitable for a crosswalk without "an appropriate engineering study of a candidate site," which Newark had not done. And although he did not claim to have done such a study himself, he nonetheless further opined that such a study would have shown the location of the accident was unsuitable for a crosswalk and did not need one.

Thimon's expert also thought the crosswalk "was not only at an intersection that is unsuitable for a crosswalk, it was an invitation for pedestrians to cross an arterial roadway at a hazardous and uncontrolled location." He contended that Newark had failed

---

used to estimate speed, that he was driving approximately 30 to 45 miles per hour. Newark proffered the opinion of an accident reconstructionist that he was driving 35 miles per hour, but the court sustained Thimon's objection to the statement as conclusory and lacking foundation. Regardless, the parties agree that he knowingly drove through the intersection with his vision obscured by the glare of the sun.

to follow guidelines in various traffic manuals stating that crosswalk markings "should not be used indiscriminately." He opined that the installation of the crosswalk created the dangerous condition because of preexisting factors, including the width and multi-lane characteristics of the road, the high traffic volume, the speed of traffic and the lack of controls at the intersection. As he put it, "[u]nnecessary painted crosswalks at uncontrolled locations are inherently dangerous."

Thimon's expert was also critical of the lack of further improvements at the crosswalk. He opined, "[p]ainted crosswalks at uncontrolled locations on high-volume and high-speed arterial roadways should always be supplemented with substantial additional improvements, such as pedestrian-actuated traffic signals."

Thimon's engineer concluded, "[t]he crosswalk markings and warning signs alone should not have been installed on Cherry Street at Redeker Place because the factors creating the dangerous condition for the marked crosswalk were already present and could have easily been discovered by the City at the time the markings and signs were installed. However, once the crosswalk markings were installed, the City of Newark was then obligated to install substantial improvements (over and above the warning signs), such as pedestrian actuated traffic signals, to assist pedestrians using the marked crosswalk because the City was telling pedestrians they should cross at the marked crosswalk." He further stated, "[b]ut for the installation of the subject marked crosswalk in clear opposition to established engineering standards and guidelines, it is unlikely that the plaintiff would have chosen to cross Cherry Street at this uncontrolled location and the subject accident would not have occurred. In general, pedestrians and motorists using Cherry Street are unaware of the factors that contribute to the dangerous nature of the subject crosswalk (which include high traffic speeds, high traffic volumes, and the position of the sun during the morning hours in fall and winter), and because no traffic controls are present to mitigate these factors, the crosswalk creates a trap for pedestrians and motorists using the City's facility with due care."

7

## C. The Trial Court's Ruling

After a hearing, the trial court granted Newark's motion, concluding Newark had made the required prima facie showing to shift the burden to Thimon to demonstrate that a reasonable jury could find in her favor as to her cause of action for dangerous condition. Noting that Soudachanh had testified he was very familiar with the Cherry/Redeker intersection and the problems with visibility presented by the glare of the sun, the court stated Thimon had failed to identify any factor other than the glare of the sun that prevented Soudachanh from seeing her as she was crossing in the sidewalk. The court also found probative of the lack of a dangerous condition the evidence showing that over a 10-year period preceding the accident there had been no vehicle versus pedestrian accidents within the subject crosswalk.

## DISCUSSION

## I.

### *Legal Standards*

## A. Dangerous Condition Liability

The governing law in this dispute over the condition of the Cherry/Redeker intersection is the Government Claims Act (Gov. Code, § 810 et seq. (the Act)). "Section 835 . . . of the Act . . . prescribes the conditions under which a public entity may be held liable for injuries caused by a dangerous condition of public property. [Citation.] Section 835 provides that a public entity may be held liable for such injuries 'if the plaintiff establishes [1] that the property was in a dangerous condition at the time of the injury, [2] that the injury was proximately caused by the dangerous condition, [and] [3] that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred.' In addition, the plaintiff must establish [4] that either: (a) '[a] negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition,' or (b) '[t]he public entity had . . . notice of the dangerous condition . . . a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.' " (*Cordova v. City of Los Angeles* (2015) 61 Cal.4th 1099, 1105 (*Cordova*).)

8

"The Act defines a ' "[d]angerous condition" ' as 'a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used.' ([Gov. Code,] § 830.) Public property is in a dangerous condition within the meaning of [Government Code] section 835 if it 'is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself.' " (*Cordova*, *supra*, 61 Cal.4th at p. 1105.) "But public property has also been considered to be in a dangerous condition 'because of the design or *location* of the improvement, the interrelationship of its structural or natural features, or the presence of latent hazards associated with its normal use.' " (*Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 149 (*Bonanno*).) "A dangerous condition of public property can come in several forms and may be based on an 'amalgam' of factors." (*Salas v. Dept. of Transportation* (2011) 198 Cal.App.4th 1058, 1069 (*Salas*).) "A condition is not dangerous 'if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial, or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used.' ([Gov. Code,] § 830.2.)" (*Cordova*, at pp. 1104-1105.)

The fact that Soudachanh's negligence was a proximate cause of Thimon's injury does not preclude a finding of dangerous condition. "[I]f a condition of public property 'creates a substantial risk of injury even when the property is used with due care' [citation], a public entity 'gains no immunity from liability simply because, in a particular case, the dangerous condition of its property combines with a third party's negligent conduct to inflict injury.' " (*Cordova*, *supra*, 61 Cal.4th at p. 1105.) When a third party's conduct is the immediate cause of a plaintiff's harm, the question becomes whether the dangerous condition "increased or intensified" the risk of injury from the

9

third party's conduct.  (*Zelig v. City of Los Angeles* (2002) 27 Cal.4th 1112, 1137; *Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1348.)

On the other hand, a public entity is not required to assume that third parties such as Soudachanh will act negligently or recklessly.  "As one court has observed, any property can be dangerous if used in a sufficiently improper manner.  For this reason, a public entity is only required to provide roads that are safe for reasonably foreseeable careful use.  [Citation.]  'If [ ] it can be shown that the property is safe when used with due care and that a risk of harm is created only when foreseeable users fail to exercise due care, then such property is not "dangerous" within the meaning of section 830, subdivision (a).' "  (*Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1196.)

"Ordinarily, the existence of a dangerous condition is a question of fact, but whether there is a dangerous condition may be resolved as a question of law if reasonable minds can come to but one conclusion.  [Citation.]  '[I]t is for the court to determine whether, as a matter of law, a given defect is not dangerous.  This is to guarantee that cities do not become insurers against the injuries arising from trivial defects.' "  (*Salas*, *supra*, 198 Cal.App.4th at p. 1070.)  Moreover, "expert opinions on whether a given condition constitutes a dangerous condition of public property are not determinative: '[T]he fact that a witness can be found to opine that such a condition constitutes a significant risk and a dangerous condition does not eliminate this court's statutory task pursuant to [Government Code] section 830.2, of independently evaluating the circumstances.' "  (*Sun v. City of Oakland* (2008) 166 Cal.App.4th 1177, 1189 (*Sun*).)

## B.  Summary Judgment

As in other cases, a motion for summary judgment in a dangerous condition case " 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).)"  (*Salas*, *supra*, 198 Cal.App.4th at p. 1067.)  "A defendant meets his burden of showing that a cause of action has no merit if he shows that one or more of the elements of the cause of action cannot be established, or that there

10

is a complete defense.  (Code Civ. Proc., § 437c, subd. (p)(2).)  Once the defendant has met that burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists."  (*Ibid.*)

We review the trial court's grant of summary judgment de novo.  (*Salas*, *supra*, 198 Cal.App.4th at p. 167.)  We consider all of the evidence considered by the trial court in a light favorable to Thimon, liberally construing her evidentiary submissions while strictly scrutinizing Newark's showing and resolving any evidentiary doubts or ambiguities in her favor.  (See *ibid*.)  We employ the same three-step analysis as the trial court, first, identifying the issues raised by the pleadings; second, determining whether Newark's showing established facts which negated Thimon's claims and justified a judgment in its favor; and third, if Newark made this showing, determining whether Thimon demonstrated the existence of a triable, material factual issue.  (See *ibid*.)

## II.

### *Summary Judgment Was Properly Granted.*

**A.** **Newark Met Its Prima Facie Burden.**

Thimon contends Newark failed to make a prima facie showing that there was no dangerous condition because it "did not negate the existence of the totality of the circumstances by which a dangerous condition was alleged to exist."  She accuses Newark of having "[c]herry-picked factual items which, on an individualized basis may support summary judgment under a particular authority" but failing to negate "the 'amalgam' or combination of features . . . pled."  We disagree.

Newark proffered evidence establishing that Cherry has no blind corners, elevation variances, trees, plants or shrubbery that would obstruct a driver's view of a pedestrian in the area of the Cherry/Redeker intersection; that the intersection had a crosswalk painted with white lines; that signs warning of pedestrians had been installed on the approach to the intersection; that although the sun impeded Soudachanh's view, he was aware of the glare well before he approached the intersection; that Soudachanh was neither wearing sunglasses nor the prescription glasses required by his license, but

11

instead was only wearing drug store reading glasses; that police found Soudachanh violated the Vehicle Code (by failing to yield to a pedestrian in a crosswalk and traveling at an unsafe speed), which caused the accident; and that despite the heavy morning commute traffic and sun glare during certain months there was no history of collisions at this crosswalk involving pedestrians in the 10 years prior to this accident. (See, e.g., *Salas*, *supra*, 198 Cal.App.4th at pp. 1062-1064.) The absence of prior similar accidents supports the inference that drivers exercising due care, such as by driving more slowly or taking other precautions to mitigate the effect of the sun's glare, would not have caused such an accident. (*Id.* at pp. 1064, 1071; *Mixon v. Pacific Gas & Elec. Co.* (2012) 207 Cal.App.4th 124, 138 (*Mixon*).) This in turn indicates the "substantial risk" requirement of Government Code section 830, subdivision (a) cannot be met, and there was thus no dangerous condition.[4]

Newark's prima facie showing is very similar to the facts that prevailed in *Salas*. There, a woman died after being hit by a car driving on a state highway, and the husband and his sons sued the state for dangerous condition. (*Salas*, *supra*, 198 Cal.App.4th at pp. 1061-1062.) They alleged the crosswalk in which the woman was hit constituted a dangerous condition for a host of reasons, many similar to those asserted here. These included the city's failure to design or install proper signage, controls or signals; failure to provide safe streets or highways; failure to follow recommended standards as to the location and design of the crosswalk; placement of the crosswalk in the location without proper safety devices; and failing to enforce or control speed in the area. (*Id.* at p. 1062.)

Caltrans showed the road at the accident location was straight and level and that there were no "sight obstructions" for motorists or pedestrians in the area of the collision.

---

[4] See 2 Cal. Government Tort Liability Practice (4th ed. 1999, 2019 rev.) § 12.20, stating the "substantial risk of injury" requirement "reflects the legislature's concern that an undue burden would be placed on public entities if they were responsible for the repair of all conditions creating any possibility of injury, however remote that possibility might be. 4 Cal L Rev'n Comm'n Reports 822 (1963). See Law Revision Commission Comment to [Gov. Code,] § 830.2; *Fredette v. City of Long Beach* (1986) 187 [Cal.App.]3d 122, 130[, fn.] 5 (legislature was concerned with frequency or probability that injury would occur, not extent of injury)."

(*Salas*, *supra*, 198 Cal.App.4th at pp. 1062-1063.) It also pointed to witness statements that the driver had not been exceeding the speed limit, that as he had approached the intersection the decedent had moved first in one direction and then another and that the car had swerved in response to her and hit her when she reversed course. (*Id*. at p. 1063.) Furthermore, police had determined the driver caused the accident by failing to yield to a pedestrian and driving at an unsafe speed for the conditions, and that the decedent's last-minute change of direction was a factor in the accident. (*Id*. at p. 1064.) Caltrans also showed that in the 10 years preceding the accident there had been heavy vehicle traffic but no pedestrian-vehicle collisions. (*Ibid*.)

On appeal, the Third District affirmed the trial court's ruling that, based on this evidence, Caltrans had made a prima facie showing that "no condition of property 'creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used.' " (*Salas*, *supra*, 198 Cal.App.4th at p. 1071.) Newark's showing in this case is very similar to Caltrans's and we likewise conclude it demonstrates, prima facie, that no condition of the property created a dangerous condition.

We also disagree with Thimon's contention that Newark's showing addressed each allegedly dangerous feature of the intersection individually and did not address the entire combination together. It is true that a dangerous condition may consist of an " 'amalgam of factors' " (*Salas*, *supra*, 198 Cal.App.4th at p. 1069) and that Thimon alleges a wide variety of features that a public property either has or lacks that allegedly make it a "dangerous condition." As we have discussed, the complaint alleges that the glare from the morning sun at certain times of the year and the day obscured motorists' ability to see pedestrians; that the placement of a crosswalk with only single white lines was improper; that the failure to install "stop signs," "traffic signals," a "blinking yellow arterial to warn drivers of the impending crosswalk" or "pedestrian actuated mechanisms to alert a driver of a pedestrian's use of the crosswalk" made the crosswalk dangerous; and that the "hazards presented by [the intersection's] location" (such as the four-lane

13

width of Cherry Street, 45 miles per hour speed limit and the heavy morning commute traffic) contributed to the danger. Nonetheless, Thimon fails to explain how a defendant faced with this kind of kitchen-sink approach is to carry his or her burden to address such a multiplicity of factual theories. Other than to address, as to each alleged factor, why it does not constitute a dangerous condition, whether alone *or in combination with others*, and/or to present evidence, such as the absence of similar collisions, that otherwise demonstrates that no condition of the property posed a substantial risk of injury to persons exercising due care, we can think of none. Newark did both in its moving papers. Along with the evidence we have already discussed, Newark presented evidence and argument regarding each of Thimon's allegedly dangerous features. It also presented a study by a consulting company conducted shortly after the accident that analyzed whether a traffic signal was warranted at the intersection based on the criteria for traffic signals in the California Manual on Uniform Traffic Control Devices, which study concluded a traffic signal was not warranted.

In short, Thimon's contention that Newark failed to meet its burden because it did not address "the 'amalgam' or combination of features . . . pled" is without merit.

**B.**                                                    **Thimon Failed to**
**Raise a Triable Issue of Material Fact.**

Having established that Newark met its burden, we turn now to whether Thimon raised a triable issue of material fact in her opposition. We conclude she did not.

Thimon correctly points out that Soudachanh's negligence does not preclude a finding of dangerous condition. When third-party negligence or misconduct has proximately caused a plaintiff's injury, the question is whether the alleged dangerous condition " 'increased or intensified' the danger to users from third party conduct." (*Bonanno*, *supra*, 30 Cal.4th at p. 155; *Cerna*, *supra*, 161 Cal.App.4th at p. 1348.)

As Thimon contends in her opening brief, the "combination of circumstances" that made the marked crosswalk at the Cherry/Redeker intersection a dangerous condition includes "the width of the roadway *combined with* the high speeds of vehicular traffic *combined with* the lack of traffic controls *combined* with the glare of the morning sun

14

*combined with* the absence of pedestrian actuated devices." Thimon theorizes that because the Cherry/Redeker intersection had these features, Newark's marking the crosswalk with white lines and installing signs created the dangerous condition, which could only be mitigated if signals or other pedestrian activated devices were provided.

Thimon's contentions do not create a triable issue of material fact. Given that Soudachanh's negligence was a proximate cause of Thimon's injuries, she must also explain how Newark's painting of lines to demarcate the crosswalk along with installing signs warning motorists of the pedestrian crossing "increased or intensified" the risk of injury to pedestrians crossing at that location. There is no evidence that these improvements did so.[5]

In her opposition, Thimon relied on her engineering expert to raise a triable issue of material fact regarding her dangerous condition theory in three particular respects. First, he opined that Newark failed to follow certain guidance set forth in the applicable Caltrans traffic manuals when it installed and repainted the crosswalk in 1998 and 2003 by marking the crosswalk "indiscriminately," misperceiving the purpose served by crosswalks as enhancing pedestrian safety and failing to "sufficiently stud[y] the location before the crosswalk was installed." This does not create a triable issue of material fact for several reasons. Foremost among them is that there is no evidence in the record to support these conclusory opinions. Also problematic is the expert's failure to address the fact that, as pointed out by Newark's expert, with exceptions not relevant here, the provisions in the manuals he relied on provide only "general guidance"; they do not set forth hard and fast rules for marking crosswalks but instead encourage government

---

[5] Notably, cities have been sued and in some cases held liable for the *failure* to mark a crosswalk in combination with other factors, such as in *Gardner v. City of San Jose* (1967) 248 Cal.App.2d 798 and *Antenor v. City of Los Angeles* (1985) 174 Cal.App.3d 477, 479, 483, and for the removal of crosswalk markings, such as in *Sun*, *supra*, 166 Cal.App.4th at p. 1189. In *Gardner*, this court considered the city's failure to "cause the crosswalk to be marked" and provide warning signs "important factors" that contributed to a dangerous condition. (*Gardner*, at p. 803.)

personnel to consider a list of factors in exercising engineering discretion to determine an intersection's design.

Finally, Newark presented undisputed evidence in the form of a declaration from its current public works director, an engineer within the department at the relevant times, who described the custom and practice of his department regarding work order requests for marked crosswalk installations. This custom and practice involved three layers of review by engineering staff at increasing levels of responsibility and evaluation of the proposal for compliance with rules, regulations, design standards and guidelines pertaining to the work being proposed. Newark was apparently unable, due to the passage of time (15 years or more) and retirements, a disabling illness and deaths of most of the personnel involved, to describe the substance of its evaluation of this intersection when installing and re-marking its crosswalk. Nonetheless, its use of this extensive evaluation process for the marking and remarking of the Cherry/Redeker crosswalk was established by work orders initialed by two former engineering employees and the then-director of the public works department that signified the preparation, review and recommended approval, and approval of these installations. This undisputed evidence shows Newark's engineering professionals exercised the discretion called for by the Caltrans manuals. (See also Evid. Code, § 664 [presumption that official duty has been regularly performed].)

Second, Thimon's expert theorized that marking the crosswalk increased the likelihood that a pedestrian like Thimon would use it. This theory does not create a triable issue of fact. Assuming more pedestrians used the intersection because the crosswalk was marked does not establish the crosswalk was a dangerous condition because an increase in pedestrian use did not increase or intensify the danger of injury to Thimon when she used the crossing. Our colleagues' opinion in *Sun*, *supra*, 166 Cal.App.4th 1177 makes this very point. There the plaintiff's expert opined that "bulb outs" such as those Oakland had installed at the crosswalk of a busy street where the plaintiff was injured had the effect of " 'further invit[ing] pedestrians to cross a street' " and led pedestrians " 'to believe they could cross safely.' " (*Id*. at p. 1188.) The

16

court rejected the argument that this established a dangerous condition, observing, "there is nothing about heavy pedestrian use that increased or intensified the danger to [the plaintiff] as she attempted to cross the street." (*Id.* at p. 1190.) The same is true here.[6]

Also, the expert's assertion that Thimon would not have crossed at Redeker if the crosswalk had not been marked was entirely speculative, especially in light of her having already bypassed two opportunities to cross at intersections equipped with traffic signals, and was of marginal, if any, relevance in assessing whether there was a dangerous condition at the Cherry/Redeker intersection. (See *Huffman v. City of Poway* (2000) 84 Cal.App.4th 975, 992 [whether condition of property poses substantial risk of injury to foreseeable users exercising due care is objective standard measured by risk posed to ordinary foreseeable user].)

Third, Thimon's expert opined that the crosswalk created a "trap" because "pedestrians and motorists using Cherry Street are unaware of the factors that contribute to the dangerous nature of the subject crosswalk." This opinion also does not raise a triable issue of material fact, since undisputed evidence shows the conditions Thimon claims are dangerous were apparent to pedestrians. "The manifest intent of the Tort Claims Act is to impose liability only when there is a substantial danger which is *not* apparent to those using the property in a reasonably foreseeable manner with due care." (*Fredette v. City of Long Beach* (1986) 187 Cal.App.3d 122, 131; see also *Biscotti v. Yuba City Unified School Dist.* (2007) 158 Cal.App.4th 554, 560 [it is a "common sense proposition that premises liability may not be imposed on a public entity when the danger of its property is readily apparent"].) Here, Newark showed *and Thimon did not dispute* facts showing none of the features of the intersection Thimon claims posed a danger were

---

[6] The expert's reliance on studies showing there are more pedestrian accidents in marked than unmarked crosswalks at uncontrolled intersections on high speed arterials does not change this analysis. These studies show a correlation between marked crosswalks and increased accidents, but none show that marking increases the risk of injury to a pedestrian who uses the intersection. Rather, as one of the studies observed, *the evidence "suggests that the poor accident record of marked crosswalks is not due to the crosswalk being 'marked' as much as it is a reflection on the pedestrian's attitude and lack of caution when using the marked crosswalk."* (Italics added.)

17

hidden from pedestrians using the crosswalk. Cherry Street at, approaching and beyond the crosswalk was straight and level, without significant curves, elevation variances, blind corners or sight obstructions. Nor were there trees, plants or shrubbery that would prevent drivers from seeing pedestrians or, conversely, pedestrians from observing the oncoming traffic on Cherry Street. Thus, nothing prevented pedestrians from observing the volume of the oncoming traffic or its speed. Given these conditions, there is no reason to believe the width of Cherry at the intersection with Redeker was not apparent to any pedestrian using the crosswalk. The same is true of the absence of a signal or other traffic controls. Likewise, all pedestrians walking on Cherry who exercised due care by looking both ways before crossing would be exposed to the same intense sun glare as southward traveling motorists experienced. (Cf. *Mixon, supra,* 207 Cal.App.4th at p. 134 [" 'it is obvious to all when a streetlight is out' "]; *Chowdhury v. City of Los Angeles*, *supra*, 38 Cal.App.4th at p. 1194 [obviously inoperative traffic signals during a power outage did not amount to dangerous condition as a matter of law].)

Thimon especially relies on *Erfurt v. State of California* (1983) 141 Cal.App.3d 837 for the proposition that "glare of the sun combined with other features of a roadway can constitute a dangerous condition." While this proposition in the abstract may or may not be correct, *Erfurt* adds nothing to her dangerous condition argument. There, the appellate court affirmed a judgment for Erfurt that was based on a dangerous condition theory. (*Id*. at pp. 843, 846.) Erfurt was driving over the crest of a hilly section of a three-lane highway in the early morning when she was suddenly blinded by the rising sun on the horizon. She kept going straight, but her car nonetheless collided with an object in the road and seconds later was hit by another car from the rear. (*Id*. at p. 840.) Evidence at trial indicated that the object she had hit was a pillar supporting an overpass for another highway and that unbeknownst to Erfurt the center lane in which she had been travelling had split into a Y, with half the lane going left and half going right around the pillar. (*Id*. at p. 841.) The presence of the pillar directly in the path of travel in the center lane and the lane's suddenly splitting into two with a part veering off to the left was, as a traffic engineer testified, "peculiar," and the road's striping did not meet the

18

minimum standard for "channelization." (*Id.* at p. 842.) The crosswalk conditions alleged here are not remotely comparable to the mid-lane, mid-highway pillar at the center of the *Erfurt* case. Therefore, the case is inapposite, and also fails to establish that sun glare without the presence of other hazardous conditions can be a basis for liability.

We also note that the overwhelming weight of authority, including from our own court, strongly suggests that an intersection with a crosswalk but no signals, whether marked or unmarked, is *not* a dangerous condition within the meaning of the Government Claims Act even when it is located on a high-speed, high-traffic road, particularly in the absence of a history of other collisions. For example, in *Cerna*, *supra*, 161 Cal.App.4th 1340, this court affirmed summary judgment for the City of Oakland, holding there was no dangerous condition where an eastbound motorist hit a woman and five children, killing one child, in a marked crosswalk without a traffic light on Oakland's International Boulevard, a four-lane thoroughfare, when the sun was "intensely strong" and in the direct line of sight of eastbound motorists. (See *id*. at pp. 1345-1346, 1352.) Among other things, the court applied the rule that the lack of a traffic signal at the intersection alone does not constitute proof of a dangerous condition. (*Id*. at p. 1351 [citing Gov. Code, § 830.4].) In *Salas*, *supra*, 198 Cal.App.4th 1058, the Third District affirmed summary judgment for Caltrans where a decedent was hit in a marked crosswalk on a busy state highway with a 45 mile per hour speed limit, in part because Caltrans proffered evidence that "no other collisions involving pedestrians had occurred [at the intersection] in a 10-year period, although over 30 million vehicles had passed through the intersection," which, while "not dispositive," was relevant to the issue of dangerousness. (*Id*. at p. 1071.) In *Mixon*, *supra*, 207 Cal.App.4th 124, this court affirmed a grant of summary judgment in favor of Caltrans, holding that an intersection on a state highway was not a dangerous condition despite dim lighting, the lack of traffic control signals or pedestrian warning signs, the presence of confusing signal-ahead signs referring to an upcoming intersection, parallel crosswalk markings instead of more visible patterns and a dip in the grade of the intersection. (*Id*. at pp. 129, 132, 138.) The court held these features, alone or in combination, did not show the intersection was a

19

dangerous condition, especially since there had been no similar accidents despite a high volume of traffic. (*Id*. at pp. 137-138.) And in *Sun, supra,* 166 Cal.App.4th 1177, this court affirmed the grant of summary judgment to the City of Oakland where a plaintiff was killed while crossing International Boulevard in a crosswalk that was allegedly "poorly lit." (*Id.* at p. 1184.) In holding there was no dangerous condition, the court quoted the following passage from a case involving a vehicle-bicycle collision: " 'Many of the streets and highways of this state are heavily used by motorists and bicyclists alike. However, the heavy use of any given paved road alone does not invoke the application of Government Code section 835.' " (*Id.* at p. 1189.)

While Thimon correctly points out that none of these cases addressed the precise same list of conditions she has alleged here, they and other cases[7] implicitly reject the idea that an intersection on a heavily travelled thoroughfare is made dangerous by the type or existence of crosswalk markings, the lighting conditions, or the lack of traffic signals or other devices. The plaintiff's expert, to be sure, opined otherwise. We reiterate, however, that the proffer of an expert declaration opining that a condition is dangerous does not preclude summary judgment. (*Sun*, *supra*, 166 Cal.App.4th at p. 1189.) Indeed, the plaintiffs submitted expert declarations in each of the above-cited cases, yet the appellate courts affirmed summary judgment. (See *id*. at pp. 1188-1189 [expert opinion on bulb outs and removal of crosswalk]; *Cerna*, *supra*, 161 Cal.App.4th at p. 1349 [expert traffic engineer]; *Mixon*, *supra*, 207 Cal.App.4th at pp. 132, 136

_____

[7] See also *Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434 (affirming order sustaining demurrer where complaint alleged intersection was dangerous because of increased traffic volume and speed, high pedestrian use and failure to install traffic control devices or signs); *Antenor v. City of Los Angeles*, *supra*, 174 Cal.App.3d 477 (affirming directed verdict for defendant where the plaintiff contended uncontrolled intersection on high traffic volume street with four lanes and inadequate lighting constituted dangerous condition); *Plattner v. City of Riverside* (1999) 69 Cal.App.4th 1441 (affirming summary judgment for city where the plaintiff was injured in crosswalk, rejecting argument that crosswalk near inoperative street light created dangerous condition); *Mittenhuber v. City of Redondo Beach* (1983) 142 Cal.App.3d 1, 7 (affirming order sustaining demurrer and dismissing bicyclist's claim that an intersection was dangerous).

[electrical engineer and lighting expert; expert opining on crosswalk marking]; *Salas*, *supra*, 198 Cal.App.4th at pp. 1065, 1075 [civil engineer with experience in traffic safety].)[8] As these cases indicate, expert opinions on whether a given condition constitutes a dangerous condition of public property are "not determinative" and do not necessarily raise triable issues of fact. (See *Sun*, at p. 1189.) On the contrary, in fulfilling its " 'statutory task, pursuant to [Government Code] section 830.2, of independently evaluating the circumstances,' " a court may determine that the conditions shown do not constitute a dangerous condition as a matter of law and that no triable issue of material fact has been raised by the evidence, including one or more expert declarations. (*Ibid*.)

We so conclude here. In light of the undisputed evidence, including the lack of any similar collisions over the 10 years preceding the accident during which tens of millions of vehicles passed through this intersection,[9] we agree with the trial court that the tragic accident and injury plaintiff suffered was caused entirely by the negligence of a driver and not by any dangerous condition of public property.

## DISPOSITION

Regarding Thimon's appeal, the judgment of the trial court is affirmed. Newark's cross-appeal is dismissed as moot. The parties shall each bear their own costs on appeal.

---

[8] In *Salas*, the court affirmed evidentiary rulings by the trial court sustaining Caltrans's objections to most of the opinions in the plaintiff's expert declaration, holding plaintiff had forfeited any contention they were erroneous. (*Salas*, *supra*, 198 Cal.App.4th at pp. 1066-67, 1073-74.)

[9] Plaintiff's expert's review of citywide speed studies indicated the average daily traffic on Cherry Street at the intersection with Redeker from 2006 up to the time of the accident ranged from 18,348 to 27,212 vehicles, indicating that roughly 80 million vehicles passed through the intersection during that time without the occurrence of a single vehicle-pedestrian accident similar to the one that injured Thimon. Similar statistics have led other courts to conclude there was no dangerous condition. (*Salas*, *supra*, 198 Cal.App.4th at pp. 1064, 1071 [31.5 million vehicles over 10 years with no accidents]; *Mixon*, *supra*, 207 Cal.App.4th at p. 138 [7.8 million vehicles over five years with only one accident].) Such evidence tends to prove that any risk is remote, rather than constitutes a risk that meets Government Code section 830's requirement that it be "substantial."

21

 

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

*Thimon v. City of Newark* (A152093)

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. Dennis Hayashi

Counsel:

Brady Law Group, Steven J. Brady; and Laura S. Liccardo for Plaintiff and Appellant.

McDowall Cotter, David S. Rosenbaum and Jennifer A. Emmaneel for Defendant and Respondent.